# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 22-cr-39-CJW-1 |
| vs. | |
| | **REPORT AND RECOMMENDATION** |
| DAVID POITIER BELTON, | **ON DEFENDANT'S MOTION TO** |
| Defendant. | **SUPPRESS (VEHICLE SEARCH)** |

_____

## I.    INTRODUCTION

On April 21, 2022, the Grand Jury charged Defendant David Poitier Belton with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), (b)(1)(A), and 846 and one count of Possession of a Firearm by a Felon and Drug User in violation of 18 U.S.C. Sections 922(g)(1), 922(g)(3), and 924(a)(2). (Doc. 13.)

The matter before the Court is Defendant Belton's motion to suppress. (Doc. 256). The Government timely filed a response. (Doc. 269.) The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on the vehicle search matter on Thursday, December 1, 2022. (Doc. 292.) Defendant filed a Supplemental Brief at Doc. 303.

At issue in this Report and Recommendation is the unwarranted search by law enforcement officers in New Mexico of a vehicle being transported by a vehicle hauler to Cedar Rapids, Iowa. Defendant Belton's motions on other grounds will be taken up separately. The Government called one witness, Arcenio Chavez, a former lieutenant with the New Mexico Highway Patrol ("Lt. Chavez"), who described how law

1

enforcement ultimately discovered more than 14 kilograms of methamphetamine in a hidden compartment located behind the rear seat of a 2012 Volkswagen Passat (the "VW").

The following exhibits were admitted without objection:

1. Government's Exhibit 8, the body worn camera video of Lt. Chavez;

2. Government's Exhibit 9, documents seized from the VW in Iowa; [1]

3. Government's Exhibit 10, photographs of the interior of the VW and documents found in the VW in New Mexico.

At the close of the hearing, I left the record open to further briefing.

For the following reasons, I respectfully recommend that the District Court **Deny** Defendant Belton's Motion to Suppress evidence seized from the VW.

## II. FINDINGS OF FACT

### A. Lt. Chavez Background and Training

At the time of the hearing, Lt. Chavez was employed as a civilian with the New Mexico HIDTA.[2]  He had previously been a lieutenant with the New Mexico State Police assigned as a task for officer to the interdiction task force with Homeland Security Investigations for four years.  (Tr. 6[3].)  He had been a highway patrol officer for 22

---

[1] The parties stipulated on the record that the documents in Exhibit 9 were seized from the VW after it arrived in Iowa.  Defendant Belton has not objected to that seizure.

[2] A post-hearing internet search shows:

> The New Mexico High Intensity Drug Trafficking Area (HIDTA) . . . consists of 17 HIDTA designated counties working together to coordinate drug intelligence, interdiction, investigation, and prosecution efforts to reduce the impact of illicit drugs in New Mexico, along the southwest border, and throughout the United States.

https://www.dps.nm.gov/programs/high-intensity-drug-trafficking-area-program/ last accessed December 2, 2022.

[3] "Tr." Refers to the hearing testimony from the Court Reporter's rough draft of the transcript of the suppression hearing that was provided as a courtesy to the Court.  An official transcript

years.  Lt. Chavez explained that interdiction efforts are designed to proactively seek out smuggling of any type of illegal contraband, including narcotics.  He had been a canine handler for 17 years. (*Id.*)  He had received extensive training in "concealment," that is, the modification of motor vehicles for the purpose of smuggling contraband, and has become a national and international trainer on the subject. (*Id.* at 6-7.)  In the course of his career, he has been involved in the search of approximately 600 vehicles.  (*Id.* at 9.)

**B.**     ***The Search of the VW***

On October 14, 2020, Lt. Chavez was informed by a colleague, Sgt. Jose Ramon, that he had received a phone call from the driver ("the driver") of a commercial motor vehicle car hauler who had a suspicious vehicle he wanted law enforcement "to check." (Tr. 14.)    Lt. Chavez met the driver in a casino parking lot near Albuquerque, New Mexico.  The VW was being hauled in the far rear position of a multi-level semi-trailer designed to transport several vehicles.  The semi-trailer was parked at a gas pump when Lt. Chavez pulled up behind it and exited his vehicle to meet the driver.  Lt. Chavez and the driver engaged in a brief conversation about the circumstances that led to the transportation of the VW before the driver granted permission for the search.

The driver identified the vehicle in question as the one at the back of the trailer.  Lt. Chavez asked for and was provided the "shipping papers" (i.e., the bill of lading) for the vehicle.  (Ex. 8 at 1:15; Ex. 9 and 9A.) Lt. Chavez testified that typically shipping paperwork would not limit a hauler's right to enter the vehicle.  (Tr. 33.)[4]  Lt. Chavez

---

of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

[4] At the hearing, I noted that Government's Exhibit 9 referred to terms and conditions on the back of the bill of lading.  I left the record open for the Government to produce those terms and conditions that are now part of the record as Exhibit 9A.  I note, "That the bill of lading in these cases did not expressly authorize the drivers' consent to a search does not give rise to expectations of privacy in the cars when the circumstances make clear the driver has been given general exercise of authority to permit access to the vehicle in practice." *United States v. Reyes Reyes*, 475 F. Supp. 3d 27, 43 (D. Mass. 2020).

testified that he had not reviewed the terms on the back of the bill of lading relating to the VW or to other vehicles he had searched. The terms on the back side of the bill of lading that may be relevant to the case at bar are as follows:

> 7.0 VEHICLE INSPECTION
> 7.1 . . . [Hauler] reserves the right to refuse any shipment(s) at the point of origin if the vehicle(s) contain excessive personal items (over 200 lbs.), items blocking any window view/accessibility . . .
> 7.2 When a vehicle is picked up and conditions are not suitable to do a proper inspection . . . the Bill of Lading/Condition Report will be marked "OPEN FOR RE-INSPECTION."
> 8.0 PERSONAL ITEMS. All personal items MUST be confined to the trunk *and must not exceed 200 lbs*. . . . No electronic equipment, plants, pets, alcohol, drugs (including prescriptions) medical or legal documents, firearms, explosives, jewelry or other valuables can be transported. [Hauler] reserves the right to bill additional fees for over packed vehicles or refuse shipment of the vehicle.

(Ex. 9A at 2, emphasis and caps in original.) The bill of lading was not marked to indicate whether the inspection was completed, if the vehicle was open for re-inspection, or if it was shipped "as-is." (*Id*. at 1.)

The front of bill of lading shows the vehicle being shipped from the shipper "Trae Finn" to the consignee "Eric." (*Id*.) Lt. Chavez was suspicious that the phone number for consignee was missing. Lt. Chavez did not know if there were terms and conditions on the back of the bill of lading shown to him, although they can be briefly seen in his body camera video.

The driver stated that the vehicles had been picked up in Phoenix and that the transaction came through a broker. The driver gave a description of the shipper as a male with a beard. The race of the shipper was apparently not clear to the driver. (Ex. 8 at 2:30) The shipper told the driver the VW was being shipped to his daughter-in-law as a graduation present. The driver seemed to find this detail suspicious because graduation was months away. (*Id*. at 2:55.) The driver described how he had given the

4

shipper the option of paying up front or at the end of the trip, and the driver provided him with $1000 in cash. This struck the driver as odd. (Tr. 15-16.) Lt. Chavez was suspicious that this amount was somewhat high and that it was paid in advance, rather than after the shipment was complete. This transaction reminded the driver of a prior instance where he had unwittingly been involved in the transportation of 22 pounds of methamphetamine. In the instant case, Lt. Chavez and the driver discussed the person who "dropped off" the VW. (*Id.* at 15; Ex. 8 at 2:30.) The "drop off" is not described in great detail, but, given the nature of the trailer, it is reasonable to conclude that the driver of the car carrier loaded the vehicle onto the trailer, not the "shipper" or whoever "dropped it off."

Lt. Chavez asked for and received permission from the driver to search the VW. (Ex. 8 at 3:30.) The driver also assisted in the search by lowering the trailer and providing Lt. Chavez the key to the VW. Lt. Chavez first inspected the underside of the VW while it was still elevated on the trailer. While the minute details Lt. Chavez noted in his testimony from his exterior inspection and subsequent search of the vehicle are not obvious from his body camera video, the video generally confirms his testimony regarding the course of the inspection and search. Before the vehicle was lowered, Lt. Chavez was able to see underneath the VW and noticed missing screws and bolts that indicated potential activity to hide contraband. (Tr. 22.)

Lt. Chavez asked for and received the key to the vehicle. (Ex. 8 at 11:00.) The key appeared to have both a traditional key that would turn in a lock, as well as remote functionality. Lt. Chavez remarked to the driver that the VW had no license plate. (Ex. 8 at 11:13.) Lt. Chavez testified that while this was not unusual, it would limit the ability to locate the registered owner. (Tr. 24.) Lt. Chavez attempted to open the trunk with the remote function of the key fob, but it would not open. (Ex. 8 at 11:30; Tr. 23.) This

made Lt. Chavez suspicious that the trunk had been "disable[d]" to help hide contraband. (Tr. 23.)

He opened the rear passenger side door of the VW and commenced an interior search. (Ex. 8 at 11:39.) Among other search activities, Lt. Chavez tried the back seat latches to fold the rear seat forward, to no avail. (*Id.* at 12:20.) He believed the seat should have folded down and there should have been a passthrough to permit access to the trunk from the passenger compartment. (Tr. 24.) He noted that the fabric of the rear console seemed resewn and not "factory."[5] He also noted that the back seat smelled of grease, something that might have been used to confuse drug detection dogs. (Ex. 8 at 12:50, 14:20.) He became suspicious of the carpet that had been glued down, wires running in an unexpected place, and welds that were not consistent with his experience of normal manufacturing of vehicles. (Tr. 28.) During this process he turned on the VW's ignition and tried various combinations of switches before discovering that the trunk opened with the hazard light switch. (Ex. 8 at 24:40.)

The interior of the trunk appeared suspicious to him due to presence of canned dog food that might have been placed there to distract narcotics detection dogs. (Tr. 29.) He was also suspicious of the angle of the back seat which may have been altered to create a compartment for contraband. (*Id.*) After making multiple attempts to discover the means to electronically open the suspected hidden compartment, he drilled a hole to manually release the latch holding the seat. (Ex. 8 at 1:29:00.) The ultimate discovery of the methamphetamine was not recorded on the video, but a photograph of the compartment where it was concealed is shown in Exhibit 10 at 3. Lt. Chavez testified that the "anomalies" that he noticed during his inspection of the VW were not consistent with normal wear and tear. (Tr. 39.)

---

[5] Lt. Chavez seemed to use the term "factory" to distinguish a vehicle's condition at the time of its manufacture, as opposed to a condition that would include post-manufacturing alterations.

Inside the VW was a California vehicle registration listing Defendant Belton as the owner that was issued on May 24, 2018 and had expired on May 24, 2019. (Ex. 9 at 5.) Another registration listing Defendant Belton located in the vehicle was issued on May 24, 2019 and had expired on May 24, 2020. (Tr. 32, Ex. 9 at 4.) "Belton David Poitier" is also listed as the "registered owner" in a "Notice of Incomplete Renewal and Report of Deposit Fees" with a "date of deposit" of June 11, 2020 that was seized from the VW. (Ex. 9 at 10.) A toll evasion citation from June 6, 2019 issued to Defendant Belton was also seized from the VW. (*Id*. at 2.) An Automobile Club of Southern California document issued June 6, 2019 and bearing Defendant Belton's name (but not listing the VW) was seized from the VW. (*Id*. at 11.) An Iowa Insurance Card that expired November 2, 2020 was located in the VW, but it listed others as the insureds. (*Id*. at 6.)

## III.   DISCUSSION

### A.   *The Parties' Arguments*

Defendant's sole argument is that the driver of the car hauler did not have authority to consent to the search because the hauler was a mere bailee of the VW. The Government argues that the evidence does not establish Defendant's standing to object to the search because the documentation found in the VW and the other evidence do not sufficiently establish his connection to it.

Even if Defendant Belton was the VW's owner, the Government asserts, he has not established he was the bailor of the VW and that he had a reasonable expectation of privacy in it. The Government argues that the driver had the authority to consent to the search. Finally, the Government contends that even if the driver lacked authority to consent to the search, law enforcement had probable cause to search the VW and, due to the automobile exception to the warrant requirement, the unwarranted search was permissible. (Tr. 46-49.)

7

**B.     Standing**

Courts have routinely "declined to extend the benefits of the exclusionary rule to defendants whose personal Fourth Amendment rights have not been infringed upon . . . " *United States v. Symonevich*, 688 F.3d 12, 20 (1st Cir. 2012). To establish standing to challenge a search, a defendant must demonstrate a reasonable expectation of privacy in the place to be searched. *United States v. Barragan*, 379 F.3d 525, 529 (8th Cir. 2004). "An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" *Id.* (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (citing *Rakas v. Illinois,* 439 U.S. 128, 130-31 n.1 (1978)). A defendant must establish both that he asserted a subjective expectation of privacy in the place to be searched and that the expectation was objectively reasonable. *United States v. Douglas*, 744 F.3d 1065, 1069 (8th Cir. 2014) (citations omitted).

"If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Gomez*, 16 F.3d at 256 (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991)). The Court determines whether a defendant has proven a sufficiently close connection considering the totality of the circumstances surrounding the search. *See id*. Among the factors the Court may consider are the defendant's "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access . . . the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *Id.* (citing *Sanchez*, 943 F.2d at 113). The United States Supreme Court "has explained that '[l]egitimation of expectations of

8

privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 n.12 (1978)).

For the reasons discussed below, I recommend the Court find that Defendant Belton lacks standing to challenge the search of the VW. To establish his subjective expectation of privacy, Defendant must demonstrate that by his conduct, he sought to preserve the contents of the vehicle as private. *See, e.g., United States v. Welliver*, 976 F.2d 1148, 1151 (8th Cir.1992), cert. denied, 507 U.S. 1004, 113 S. Ct. 1643, 123 L.Ed.2d 265 (1993); *see also United States v. Stallings*, 28 F.3d 58, 60 (8th Cir. 1994) (same). Defendant Belton's relationship to the VW and any actions he may have taken to protect it from any search are far from clear. The evidence tends to show that at some point Defendant Belton had been the VW's registered owner. He had most recently registered the vehicle, according to documents found in the VW, in May of 2019 and that registration had expired approximately five months prior to the search. Under the circumstances, these expired registrations and other documents with Defendant Belton's name on them do not establish his standing to challenge the search of the VW.

It may be helpful to distinguish the instant case from a more usual one, i.e., a case where a defendant seeks to challenge the search of a car he was driving at the time of a traffic stop. In such a case, the fact that defendant's registration had expired would not preclude him from establishing standing. In the instant case, however, Defendant's relationship to the VW is much more tenuous. Defendant was obviously not in possession of the vehicle and there is no evidence to conclude that he was himself (or was connected to) either the shipper or the consignee. Defendant Belton did not offer any evidence to tie himself more closely to the VW. No doubt it was a sensible strategic decision to avoid bolstering his relationship to a vehicle loaded with more than 14 kilos of

9

methamphetamine.  Nevertheless, the evidence permits little more than speculation about Defendant Belton's relationship to the vehicle at the time of the search.  The bill of lading shows the VW was shipped from someone named "Trae Finn" to "Eric."  There is no evidence to show Defendant Belton's relationship to either of these parties.  There is no basis to determine whether there has been an intervening transfer of title to the vehicle between the last registration and the search.  Similarly, there is no basis to conclude that Defendant Belton had taken any action other than register the VW in the past to preserve some expectation of privacy in it.  Thus, Defendant has not established his subjective expectation of privacy in the vehicle.

I also conclude Defendant has not established an objective expectation of privacy in the vehicle.  This analysis is somewhat complicated by the lack of clarity regarding Defendant's relationship to the VW as described above.  In other words, without more definite evidence regarding Defendant Belton's relationship to the vehicle and the transaction that brought it to New Mexico, it is difficult to determine what expectations of privacy would be reasonable.  Thus, although the evidence does not establish Defendant Belton's actual role in the transaction that resulted in the VW's presence on the trailer, I will assume, solely for the purposes of this analysis, that Defendant Belton was the shipper, the consignee, or at least sufficiently connected to one of them to assert an interest in the vehicle.[6]

While the Eighth Circuit has not addressed the issue in the context of vehicle haulers, it has arisen elsewhere.  In *United States v. Crowder,* the Seventh Circuit held the defendant:

> did not have a reasonable expectation of privacy in [an automobile] after he turned it over to the shipper. The doors were left unlocked, the driver of

---

[6] Defendant Belton argues only that the shipper is a "mere bailee," i.e., the party that received property from another.  Again, for obvious reasons, he does not affirmatively assert that he was either the shipper (presumably the "bailor") or the intended recipient of the VW.

the car carrier was given the keys, and Crowder knew that the driver would enter the [automobile] and drive it. We conclude that no one could have a reasonable expectation of privacy in the contents of a vehicle under those circumstances. Although there is no evidence that Crowder directly authorized the driver to search the vehicle, in light of the circumstances described above it is clear that the driver was "authorized to act in direct contravention to" Crowder's privacy interest.

588 F.3d 929, 934–35 (7th Cir. 2009) (citation omitted.)  The Seventh Circuit revisited the issue in *United States v. Covarrubias*, 847 F.3d 556, 557 (7th Cir. 2017) where a car hauler gave consent to search a vehicle that lacked a license plate.  The bill of lading listed the same phone number for both parties and a stack of air fresheners was visible in the car's air conditioning vent.  *Id.*  When the car arrived at its destination, the defendant paid for the delivery and drove the car away.  *Covarrubias* held the defendant:

did not have a legitimate expectation of privacy in the car because he did not own the car, had never been inside it, and did not control the car's contents. Moreover, this case, as the district court observed, mirrors *Crowder* in legally relevant ways: the car hauler received keys to a car being shipped cross-country and permission to drive the car on and off the trailer.

*Id.* at 558 (citations omitted).  In *United States v. Reyes Reyes*, 475 F.Supp.3d 27, 43 (D. Mass. 2020), a car co-owned by the defendant was placed on a car carrier for transport across country. The contract gave the transport driver express permission to drive the car on and off the carrier and turn off alarms.  *Reyes Reyes* held,

I have concluded that an automobile traveling across the country on a car carrier, which can be unlocked and driven by the carrier-driver, is more akin to a bag entrusted to and left with a third party who is also given permission to use part of the bag, than to a bag that the owner personally accompanies during its travels. Accordingly, I find that Mr. Reyes Reyes had a diminished expectation of privacy in the car once he placed it on the carrier and no reasonable expectation that the driver would not disclose any

contents to law enforcement personnel upon a stop. Indeed, the bill of lading contained an express verification that the "vehicle [was] free of contents."

*Id.* at 43.

I find these authorities persuasive regarding the diminished expectation of privacy in a vehicle placed in the possession of a car hauler under the circumstances presented. In the case at bar, neither the shipper nor the co-signee had any expectation of privacy in the vehicle that was violated. While the shipper might have anticipated that the general public would be prevented from accessing the interior of the vehicle, a shipper should have anticipated that the driver would in fact access the interior of the car to drive it on and off the trailer. Much of the detail Lt. Chavez observed that made him suspicious of the vehicle were observed from outside the vehicle. The terms and conditions expressly contemplate that the interior of the vehicle, including the trunk, would be inspected for excessive or impermissible personal property. Finally, Lt. Chavez testified that, in his training and experience, haulers routinely reserve the right to inspect the interior of the vehicle and routinely do so. Under these circumstances, if one assumes Defendant Belton was still the owner of the vehicle (despite the expired registration) and/or that he was involved in the shipping transaction as the shipper or consignee, he would not have a reasonable expectation of privacy in the passenger compartment or the trunk. Thus, I conclude that Defendant Belton lacks standing to challenge the search of the VW.

## C.    *Consent to Search by Law Enforcement*

The District Court may disagree with my conclusion regarding Defendant Belton's standing to challenge the search of the vehicle. Therefore, I will address whether there was valid consent to search the vehicle. The Eighth Circuit has held:

> The Fourth Amendment requires the police to obtain a warrant to search an individual's home, unless an established exception to the warrant requirement exists. *United States v. Leveringston*, 397 F.3d 1112, 1114 (8th Cir. 2005). Consent is a valid exception to the warrant requirement,

*Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), and may be given either by the suspect or by some other person who has common authority over, or a sufficient relationship to, the premises to be searched. *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). The government bears the burden of proving that an exception to the warrant requirement exists. *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003); *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) ("The burden of establishing . . . common authority rests upon the State.").

> In determining a third party's authority to consent, the officers must reasonably believe that, given the totality of the circumstances, the third party possesses authority to consent. *Rodriguez*, 497 U.S. at 186, 110 S. Ct. 2793; *United States v. Pennington*, 287 F.3d 739, 746–47 (8th Cir. 2002) (stating that "[t]he critical facts . . . are not the actual relationship between the consenter and owner, but how that relationship appears to the officer who asked for consent." (citation and internal quotations omitted)).

*United States v. Weston*, 443 F.3d 661, 667–68 (8th Cir. 2006) (alteration in original); *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003) (whether it is reasonable to believe a third party is authorized to give consent depends on whether "the facts available to the officer at the time consent is given [would] warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched.").

"[T]he generally accepted theoretical basis for the proposition that someone other than the defendant can consent to a search is that the third party exercises some common authority over the place or item searched." *United States v. Cunningham*, No. 20-CR-104-CJW-MAR, 2021 WL 2593766, at *6 (N.D. Iowa June 24, 2021) (citations omitted). Mere ownership interest in a property, alone, is not enough for one to imply common authority; rather, "joint access or control" such that one assumes the risk that one of the others "might permit the common area to be searched" determines common authority. *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). "[W]hat is generally demanded of the many factual determinations that must regularly be made by . . . the police officer

13

conducting a search or seizure under one of the exceptions to the warrant requirement[] is not they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

Defendant Belton relies principally on *United States v. James,* 353 F. 3d 606 (8th Cir. 2003) for his argument that the driver of the car hauler could not consent to the search of the vehicle. The Government seeks to distinguish the instant case from *James.* As stated above, *James* involved computer disks the defendant stored with a third party. *James* stated:

> Most consent cases involve jointly occupied places and a roommate or cotenant who allows a search of shared space. *See, e.g., Bradley*, 869 F.2d at 419. In these instances, the factual finding of common authority makes intuitive sense. The space is jointly resided in; the parties expect intrusions into each other's limited space as a function of communal living. This is not necessarily the case when the person claimed to have given consent is only a bailee.
>
> A review of our case law and the law of other circuits shows that although a bailee of a concealed item may have potential physical access to the inner contents of the item (he can pick the lock; break the seal; open up the storage bin), this kind of access does not mean the bailee has actual authority to look at the contents of the items, or to consent to another's searching them. Put another way, one does not cede dominion over an item to another just by putting him in possession. For example, one does not give authority to a common carrier to turn over goods he shipped to law enforcement merely by entrusting the goods to the common carrier. *United States v. Kelly*, 529 F.2d 1365, 1371 (8th Cir. 1976). A girlfriend does not give her boyfriend authority to consent to a search of her purse left in the trunk of a rental car by the mere fact of their relationship and her having left it in the car. *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993). A person who entrusts a briefcase to a friend solely for storage and then instructs the friend to destroy the briefcase does not thereby give the friend authority to let the FBI search the briefcase. *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000). A lessee does not have authority to consent to a search of the lessor's financial records stored at the leased house merely on account of the lessor-lessee relationship. *Marvin v. United States*, 732 F.2d 669, 675–76 (8th Cir. 1984). Therefore, in order to show the validity

> of Mr. Laschober's consent, the government needed to introduce evidence
> of authority beyond the mere act of storage.

353 F.3d 606, 613–14 (8th Cir. 2003). The Government argues that the statement Defendant Belton relies upon, i.e., that "one does not give authority to a common carrier to turn over goods he shipped to law enforcement merely by entrusting the goods to the common carrier," is dicta. *James* relied upon *United States v. Kelly* which involved a common carrier, as authority for this proposition. In *Kelly*, the defendant challenged the search of packages for obscene materials being transported by United Parcel Service, a common carrier.

Whether or not the statement is dicta, the case at bar is distinguishable from *Kelly* and the other cases *James* relied upon. In *James* and the cases it cites, the item or location searched was entrusted to a third party merely for storage (or, as in *Kelly* transportation) in an unopened, unaltered, and uninspected condition. *James* insists on "evidence of beyond the mere act of storage." *Id.* In the case at bar, the hauler is exerting a great deal more authority over the car than merely storing it. The hauler is entitled to make an inspection of the VW, including the interior. The hauler must enter the car to make any inspection and to drive it onto the trailer. The hauler may inspect the trunk of the vehicle to insure it does not have excessive or prohibited personal property. It should also be noted from the emphasis on claims procedures on the back of the bill of lading, that the hauler is assuming liability for safely transporting the vehicle from Arizona to Iowa. A wide variety of circumstances could arise during interstate transportation that could pose a danger to the vehicle, to people, or other property that would cause the driver to access the vehicle himself or allow others to do so.[7] Thus, I conclude that even

---

[7] One can readily picture, for example, the aftermath of a snowstorm with a team of tow truck drivers struggling to winch the VW from an icy ditch and finding some reason to access the car's interior or the trunk.

if the car hauler in the case a bar is, technically speaking, a "bailee," *James* does preclude a finding that the bailee under these circumstances could consent to the search.

As Defendant Belton points out, *James* catalogues several cases where a "mere bailee" was not found to have authority to consent to a search:

> Put another way, one does not cede dominion over an item to another just by putting him in possession. For example, one does not give authority to a common carrier to turn over goods he shipped to law enforcement merely by entrusting the goods to the common carrier. *United States v. Kelly*, 529 F.2d 1365, 1371 (8th Cir. 1976). A girlfriend does not give her boyfriend authority to consent to a search of her purse left in the trunk of a rental car by the mere fact of their relationship and her having left it in the car. United States v. Welch, 4 F.3d 761, 764 (9th Cir. 1993). A person who entrusts a briefcase to a friend solely for storage and then instructs the friend to destroy the briefcase does not thereby give the friend authority to let the FBI search the briefcase. *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000). A lessee does not have authority to consent to a search of the lessor's financial records stored at the leased house merely on account of the lessor-lessee relationship. *Marvin v. United States*, 732 F.2d 669, 675–76 (8th Cir. 1984). Therefore, in order to show the validity of Mr. Laschober's consent, the government needed to introduce evidence of authority beyond the mere act of storage.

*United States v. James*, 353 F.3d 606, 614 (8th Cir. 2003). In the cases cited by the parties, the nature of the common authority over the vehicle in question is apparent. *United States. v. Reyes Reyes*, 475 F. Supp. 3d 27, 33 (D. Mass. 2020) (defendants put car on a car carrier); *United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993) (at traffic stop driver has the authority to consent to search); *United States v. Crowder*, 588 F.3d 929, 932 (7th Cir. 2009) (defendant present for delivery of the vehicle from car hauler, paid for the delivery, and had original paperwork directly from the shipper); *United States v. James*, 353 F.3d 606, 614 (8th Cir. 2003) (defendant gave discs to third party solely for the purpose of storage.)

Defendant Belton's role in the car-shipping transaction is as mysterious as his relationship to the vehicle itself.  In other words, even if the car hauler should be treated as a "mere bailee" it is far from apparent that Defendant Belton was the bailor, mere or otherwise.

The question then becomes whether the driver had apparent authority to consent to a search of the VW.  The Eighth Circuit has said:

> "Apparent authority exists when the facts available to the officer at the moment … warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *United States v. Lindsey*, 702 F.3d 1092, 1096 (8th Cir. 2013) (internal quotation marks and citations omitted). Authority exists when a "third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes." *United States v. Chavez Loya*, 528 F.3d 546, 554 (8th Cir. 2008) (citation omitted).

*United States v. Langenberg*, 52 F.4th 755, 756 (8th Cir. 2022).  Additionally,

> Consent need not be given by the defendant, but rather may be given by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). A warrantless search is justified when an officer reasonably relies on a third party's demonstration of apparent authority, even if that party lacks common authority. *See United States v. Hudspeth*, 518 F.3d 954, 958 (8th Cir. 2008) (en banc), quoting *Illinois v. Rodriguez*, 497 U.S. 177, 185–86, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) ("'[O]f the many factual determinations that must regularly be made by agents of the government,' the Fourth Amendment does not require the agents always be correct, 'but that they always be reasonable.'"). Apparent authority exists when "the facts available to the officer at the moment … warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 188, 110 S. Ct. 2793. *See also United States v. Almeida–Perez*, 549 F.3d 1162, 1170–71 (8th Cir. 2008) (explaining that even where police are mistaken as to a third party's actual authority, the search is legal if the circumstances lead the police reasonably to believe that a third party with common authority has consented). Whether

the police were reasonable to believe Ms. Hibdon had common authority over the gun safe is a legal determination reviewed de novo. *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003).

*United States v. Amratiel*, 622 F.3d 914, 915–16 (8th Cir. 2010)

In the instant case, it was reasonable for Lt. Chavez to believe the driver had authority to consent to the search. In Lt. Chavez's experience, car haulers have reserved the right to make inspection of the vehicle for safety reasons. (Tr. 43.) This would reasonably allow him to conclude that whoever shipped the VW would not expect total privacy regarding its interior. Moreover, while Lt. Chavez had not read the terms and conditions on the bill of lading, he was at least aware that some contractual provisions must have governed the transaction. For example, he was aware a hauler might charge more for personal property in the vehicle. Thus, it was reasonable to believe that the driver (with a presumably better understanding of his company's agreement with the shipper) would know whether he was contractually authorized to permit an inspection by law enforcement. Even if Lt. Chavez had studied the terms and conditions closely, those terms at the very least do not prohibit the hauler from permitting an inspection.[8]

### D.    *The automobile exception to the warrant requirement applied to the search of the VW.*

Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the

---

[8] It is not necessary to determine whether the driver had *actual* authority to permit a search. However, at least on this record, it is difficult to say the driver somehow breached the terms of the bill of lading by permitting the search. On the contrary, some of those terms support the conclusion that the hauler has the right to make an inspection and there is no limitation regarding who can perform it.

18

vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41 (citations omitted). The burden is on the Government to justify warrantless searches. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

Defendant argues that the automobile exception to the warrant requirement should not apply because the VW was not in the possession of the owner and it was "on the back of a semi." (Doc. 303 at 2.) These circumstances, Defendant asserts, mean that the vehicle was not movable in the typical sense. (*Id.*) Defendant argues that law enforcement should have seized the vehicle and applied for a warrant. (*Id.*)

Defendant does not cite any authority in support of his argument. As this Court has recently noted,

> The "ready mobility" of an automobile which justifies dispensing with the warrant requirement refers not merely to the immediacy with which a vehicle may be moved, but to the possibility that it could be moved at all—what the Court calls "inherent mobility." Accordingly, a vehicle may be searched without the need of a warrant even if the owner is in custody, *United States v. Castaneda*, 438 F.3d 891, 893–94 (8th Cir. 2006), if the vehicle is secured in a police impound lot, *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S. Ct. 3079, 73 L. Ed. 2d 750 (1982), or if the vehicle is stuck in a ditch. *United States v. Maggard*, No. 00-1146, 2000 WL 680394, at *1 (8th Cir. May 26, 2000)."

*United States v. Maccani*, 526 F. Supp. 3d 420, 448 (N.D. Iowa 2021), aff'd, 49 F.4th 1126 (8th Cir. 2022), reh'g denied, 21-2642, 2022 WL 17661549 (8th Cir. Dec. 14, 2022). *Maccani* ultimately (if somewhat reluctantly) held that an unmotorized trailer parked in the street, unattached to a motor vehicle, while its tongue was up on blocks, connected to solar panels, and crammed with evidence supporting its use as a residence --- was nevertheless a motor vehicle. (*Id.*)

In the case at bar, the VW was far more mobile than the trailer in *Maccani*. In one sense, it was as mobile as any cargo on a semi-trailer in a parking lot near an interstate. Moreover, it was the last vehicle on the trailer and could have been readily

lowered and driven away. Ultimately, to determine whether the automobile exception to the search warrant requirement applies the VW must have been "'[1] readily capable' of 'being used on the highways' and must have been '[2] found stationary in a place not regularly used for residential purposes.'" *United States v. Holleman*, 743 F.3d 1152, 1158 (8th Cir. 2014) (quoting *California v. Carney,* 471 U.S. 386, 392 (1985)); *United States v. Ross*, No. 17-CR-4071-LTS-1, 2018 WL 3091623, at *10 (N.D. Iowa Apr. 11, 2018) ("Under the automobile exception, when officers have probable cause to search a vehicle, '[a] warrant is not required . . . if [the vehicle] "is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes."' *United States v. Long*, 900 F.2d 1270, 1277 (8th Cir. 1990)[.]") (alterations in original), *R. & R. adopted*, 2018 WL 1911344 (N.D. Iowa Apr. 23, 2018).

*United States v. Alatorre* also involved an automobile being transported to Minnesota on a car hauler. No. 0:19-cr-00061-ECT-KMM, 2019 WL 5149971, at *1 (D. Minn. July 22, 2019), report and recommendation adopted sub nom. *United States v. Haydee Alatorre*, No. 19-cr-0061 (ECT/KMM), 2019 WL 4463401 (D. Minn. Sept. 18, 2019), aff'd sub nom. *United States v. Sierra-Serrano*, 11 F.4th 931 (8th Cir. 2021). *Alatorre's* reasoning is helpful here:

> The mobility of the vehicle is no longer the end of the inquiry. "[A]lthough ready mobility alone was perhaps the original justification for the vehicle exception, . . . later cases have made clear that ready mobility is not the only basis for the exception." *Carney*, 471 U.S. at 391. Another rationale justifying warrantless searches of vehicles is that a person has a less significant expectation of privacy in his or her automobile than in a home or office. *Id.* As a result, "[e]ven in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Id.* at 391–92 (discussing not only a plain-view analogy regarding the passenger compartment, but also cases where the lower expectations of privacy permitted entry into a locked trunk, sealed

packages, and hidden compartments). This diminished expectation of privacy "derive[s] . . . from the pervasive regulation of vehicles capable of traveling on the public highways." *Id.* at 392.

Following *Carney*, the Eighth Circuit has noted that both ready mobility and the reduced expectation of privacy in a vehicle justify warrantless searches under the automobile exception. *See, e.g., United States v. Hepperle*, 810 F.2d 836, 840 (8th Cir. 1987) (applying the automobile exception to a station wagon on the defendant's property that matched the description of a vehicle witnesses had spotted near the scene of a theft). Based on these rationales, the Eighth Circuit has found a warrantless vehicle search justified under the automobile exception where a pickup truck was stuck in a ditch because it had not "lost its inherent mobility" and "could have been driven away" if it was simply towed "out of the ditch." *United States v. Maggard*, 221 F.3d 1345 (8th Cir. 2000) (per curiam) (unpublished table decision). The automobile exception also applies to parked cars, even where the officers are aware that they are unlikely to be driven away, because "[i]t is the characteristic mobility of all automobiles, not the relative mobility of the car in a given case, that gives rise to the *Ross* standard which allows for warrantless searches when probable cause exists." *United States v. Perry*, 925 F.2d 1077, 1080–81 & n.4 (8th Cir. 1991) (applying the exception where the vehicle was parked in a school parking lot and the occupants were unlikely to drive it away because they had already been arrested at the time the search was conducted).

*Id.* at *12.

Moreover, the Eighth Circuit has recently indicated that the applicability of the automobile exception is unlikely to turn on the how readily mobile the vehicle is:

The automobile exception may apply even when there is little to no chance that the vehicle will be moved or its contents destroyed. *Cady v. Dombrowski*, 413 U.S. 433, 441–42, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). Officers armed with probable cause "may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *United States v. Bettis*, 946 F.3d 1024, 1030 (8th Cir. 2020) (quoting *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S. Ct. 3079, 73 L. Ed. 2d 750 (1982) (per curiam)). The automobile exception continues to

apply to impounded vehicles when an immediate search could have been conducted on the scene. *Brewer v. Wolff*, 529 F.2d 787, 792 (8th Cir. 1976) (interpreting *Texas v. White*, 423 U.S. 67, 96 S. Ct. 304, 46 L. Ed. 2d 209 (1975)).

*United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020).

Accordingly, I find that the VW falls under the automobile exception to the search warrant requirement. It was readily capable of being used on the highways and it was found in a casino parking lot, i.e., clearly a place not regularly used for residential purposes. Thus, the evidence need not be suppressed because there was no warrant, if there was probable cause for the search, as discussed below.

### E. Probable cause existed for a warrantless search of the trailer.

I have already found that the search was conducted with valid consent. However, because the Court may not agree with that determination, I will address whether there was probable cause for a warrantless search under the automobile exception. "Although a warrantless search usually constitutes a per se Fourth Amendment violation, the automobile exception to the Fourth Amendment's warrant requirement permits the warrantless search or seizure of a vehicle by officers possessing probable cause to do so." *Soderman*, 983 F.3d at 375 (citing *Chambers v. Maroney*, 399 U.S. 42, 51–52 (1970)).

I recommend the Court find that probable cause existed for a warrantless search at the time officers executed the search of the VW.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quoting *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)). Because "[p]robable cause is a practical and common-sensical standard," "an officer may draw inferences based on his own experience" to determine

whether probable cause exists. *Id.* (internal quotation marks and citations omitted).

*Cronin v. Peterson*, 982 F.3d 1187, 1197 (8th Cir. 2020) (finding probable cause existed for a warrantless search of an automobile).

Lt. Chavez had extensive experience in contraband interdiction, especially in the detection of hidden compartments of motor vehicles. While the driver's qualifications for detecting suspicious drug activities are unknown, he had at least one prior experience with the presence of contraband in a vehicle he was hauling that resulted in the successful detection of methamphetamine. In general, his suspicions about the VW were generally consistent with those of Lt. Chavez and provided some support for the probable cause determination.

Lt. Chavez found the bill of lading for the VW suspicious because the phone number for the consignee was missing. It was also cause for suspicion that the shipper had paid cash in advance and stated that it was a graduation gift while graduation season (usually May and June) was months away. Lt. Chavez thought the price of shipping, $1,000, was somewhat high. The absence of a license plate on the VW, while perhaps not suspicious by itself, made it difficult to determine the registered owner of the vehicle.

While the foregoing bases for suspicion may not have amounted to probable cause, Lt. Chavez noted physical indicia of tampering with the vehicle to make it suitable for hiding contraband. He noticed missing screws and bolts on the underside of the vehicle that raised his suspicions about activity to hide contraband. Moreover, the last exterior inspection activity Lt. Chavez undertook before entering the VW's passenger compartment was his attempt to open the trunk with the key fob. The mere transmission of electrical signals from a key fob to an automobile does not constitute a search. *United States v. Cowan*, 674 F.3d 947, 955 (8th Cir. 2012). The inability to open the trunk with the fob raised his suspicion that this function had been disabled to prevent the detection

of contraband.[9]  Given the totality of these circumstances, a reasonable person could believe there was a fair probability that contraband or evidence of a crime would be found in the vehicle.  Once in the vehicle, Lt. Chavez noted additional items that raised his suspicion that eventually focused his suspicion on the back seat and trunk such as the inoperable backseat latches, resewn stitching, the absence of a pass-through from the trunk, the smell of grease, and the hazard light switch operating the trunk.  These items created probable cause to believe there was hidden compartment in the area where one was ultimately discovered.  Therefore, I **recommend** the District Court find that probable cause existed for a warrantless search of the VW.  I **further recommend** that the District Court find that the automobile exception applied to the search of the VW.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motions to Suppress evidence of the vehicle search contained in **Doc. 256**.

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Crim. P. 59.  Failure

---

[9] While Lt. Chavez noted additional items that raised his suspicion in the vehicle's interior (e.g., inoperable backseat latches, resewn stitching, the absence of a pass-through from the trunk, the smell of grease, the hazard light switch operating the trunk) there is no indication that any of these items were visible from the exterior of the car. Nor has the Government urged the Court to find that any or all of these indicia of possible illegal activity could have been observed from a place where a third party (e.g., the driver) had previously entered and thereby destroyed any expectation of privacy there. *See e.g., United States v. Jacobsen*, 466 U.S. 109, 120-21 (1984) (law enforcement intrusion that stays within the limits of a private search is not a search for Fourth Amendment purposes)

to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

  **DONE AND ENTERED** at Cedar Rapids, Iowa, this 29th day of December, 2022.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa