# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-CR-39 CJW-MAR |
| Plaintiff, | |
| vs. | **ORDER** |
| DAVID POITIER BELTON, | |
| Defendant. | |

## I.    INTRODUCTION

This matter is before the Court on defendant's Motion to Suppress evidence of vehicle search.[1] (Doc. 256). The government filed a timely resistance. (Doc. 269). Following a hearing (Doc. 292) and defendant's supplemental briefing (Doc. 303), United States Magistrate Judge Mark A. Roberts recommended that this Court deny defendant's motion. (Doc. 342). Defendant timely filed his objections to Judge Roberts' report and recommendation ("R&R"). (Doc. 358).

For the following reasons, defendant's objections are overruled. The Court adopts Judge Roberts' R&R, and **denies** defendant's motion to suppress the vehicle search.

---

[1] In a separate order the Court will take up defendant's motion to suppress wiretap evidence (Doc. 256) along with motions to suppress wiretap evidence filed by his alleged co-conspirators, Derek Michael Mims (Doc. 259), Anton Tarrice Whitney, Jr. (Doc. 241), and Elmer Mims (Doc. 245).

## II. STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's R&R, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[ ] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report and recommendation when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the Court reviews the disputed portions of the Report and Recommendation de novo.

## III. FACTUAL BACKGROUND[2]

At issue in defendant's motion to suppress is the search by law enforcement officers in New Mexico of a vehicle being transported by a commercial motor vehicle hauler to Cedar Rapids, Iowa. At the hearing on defendant's motion to suppress, the government called one witness, Arcenio Chavez, a former lieutenant with the New Mexico State Police ("Lt. Chavez"), who described how law enforcement officers

---

[2] After reviewing the Hearing Transcript (Doc. 354), the Court finds that Judge Roberts accurately and thoroughly set forth the relevant facts in the Report and Recommendation. The Court thus adopts Judge Roberts' summary of the facts here. When relevant, the Court relies on and discusses additional facts in conjunction with its legal analysis.

ultimately discovered more than 14 kilograms of methamphetamine in a hidden compartment located behind the rear seat of a 2012 Volkswagen Passat (the "VW").

At the time of the hearing, Lt. Chavez was employed as a civilian with the New Mexico High Intensity Drug Trafficking Area. (Doc. 354, at 7). He had previously been a lieutenant with the New Mexico State Police assigned as a task force officer to the interdiction task force with Homeland Security Investigations for four years. (*Id.*). He had been a highway patrol officer for three years. (*Id.*, at 8). Lt. Chavez explained that interdiction efforts are designed to proactively seek out smuggling of any type of illegal contraband, including narcotics. (*Id.*). He had been a canine handler for 17 years. (*Id.*). He had received extensive training in "concealment," that is, the modification of motor vehicles for the purpose of smuggling contraband, and has become a national and international trainer on the subject. (*Id.*, at 6-7). In the course of his career, he has been involved in the search of approximately 600 vehicles. (*Id.*, at 11).

On October 14, 2020, Lt. Chavez was informed by a colleague, Sgt. Jose Ramon, that he had received a phone call from the driver ("the driver") of a commercial motor vehicle hauler ("the hauler") who had a suspicious vehicle he wanted law enforcement "to check." (*Id.*, at 16). Lt. Chavez met the driver in a casino parking lot near Albuquerque, New Mexico. (*Id.*). The VW was being hauled in the far rear position of a multi-level semi-trailer designed to transport several vehicles. (Ex. 8 at 1:15; 4:50). Lt. Chavez then followed the driver back to the gas pumps and he and the driver engaged in a brief conversation about the circumstances that led to the transportation of the VW before the driver granted permission for the search. (Doc. 354, at 16-17).

The driver identified the vehicle in question as the one at the back of the trailer. Lt. Chavez asked for and was provided the "shipping papers" (i.e., the bill of lading) for the vehicle. (Ex. 8 at 1:15; Ex. 9A.) Lt. Chavez testified that typically shipping paperwork would not limit a hauler's right to enter the vehicle. (Doc. 354, at 34). Lt.

3

Chavez testified that he had not reviewed the terms on the back of the bill of lading relating to the VW or to other vehicles he had searched. (*Id.*, at 44). The terms on the back side of the bill of lading that may be relevant here are as follows:

> 7.0 VEHICLE INSPECTION
> 7.1 . . . [Hauler] reserves the right to refuse any shipment(s) at the point of origin if the vehicle(s) contain excessive personal items (over 200 lbs.), items blocking any window view/accessibility . . .
> 7.2 When a vehicle is picked up and conditions are not suitable to do a proper inspection . . . the Bill of Lading/Condition Report will be marked "OPEN FOR RE-INSPECTION."
> 8.0 PERSONAL ITEMS. All personal items MUST be confined to the trunk and must not exceed 200 lbs. . . . No electronic equipment, plants, pets, alcohol, drugs (including prescriptions) medical or legal documents, firearms, explosives, jewelry or other valuables can be transported. [Hauler] reserves the right to bill additional fees for over packed vehicles or refuse shipment of the vehicle.

(Ex. 9A, at 2). The bill of lading was not marked to indicate whether the inspection was completed, if the vehicle was open for re-inspection, or if it was shipped "as-is." (*Id.*, at 1.)

The front of the bill of lading shows the vehicle being shipped from the shipper "Trae Finn" to the consignee "Eric." (*Id.*) Lt. Chavez was suspicious that the phone number for consignee was missing. (Doc. 354, at 18-19). Lt. Chavez did not know if there were terms and conditions on the back of the bill of lading shown to him, although they can be briefly seen in his body camera video. (*Id.*, at 44). The driver stated the vehicles had been picked up in Phoenix and the transaction came through a broker. (Ex. 8, at 1:20; 2:00).[3] The driver gave a description of the shipper as a male with a beard. (*Id.*, at 2:30). The race of the shipper was apparently not clear to the driver. (*Id.*, at

---

[3] The Court found that, on occasion, the citations to the time marks on the video were slightly off from those cited by Judge Roberts. Nevertheless, any differences are immaterial.

4

2:20). The shipper told the driver the VW was being shipped to his daughter-in-law as a graduation present. (*Id.*, at 2:45). The driver seemed to find this detail suspicious because graduation was months away. (*Id.*, at 2:55.) The driver described how he had given the shipper the option of paying up front or at the end of the trip, and the driver provided him with $1,000 in cash. (*Id.*, at 3:00). This struck the driver as odd. (*Id.*, at 3:15). Lt. Chavez was suspicious that this amount was somewhat high and that it was paid in advance, rather than after the shipment was complete. (Doc. 354, at 19). This transaction reminded the driver of a prior instance where he had unwittingly been involved in the transportation of 22 pounds of methamphetamine. (Ex. 8, at 3:20). In the instant case, Lt. Chavez and the driver discussed the person who "dropped off" the VW. (Doc. 354, at 17; Ex. 8, at 2:30.) The "drop off" is not described in great detail, but, given the nature of the trailer, it is reasonable to conclude that the driver of the car carrier loaded the vehicle onto the trailer, not the "shipper" or whoever "dropped it off."

Lt. Chavez asked for and received permission from the driver to search the VW. (Ex. 8, at 3:30). The driver also assisted in the search by lowering the trailer and providing Lt. Chavez the key to the VW. (*Id.*, at 5:45, 10:45). Lt. Chavez first inspected the underside of the VW while it was still elevated on the trailer. (*Id.*, at 6:30). Although the minute details Lt. Chavez noted in his testimony from his exterior inspection and subsequent search of the vehicle are not obvious from his body camera video, the video generally confirms his testimony regarding the course of the inspection and search. Before the vehicle was lowered, Lt. Chavez was able to see underneath the VW and noticed missing screws and bolts that indicated potential activity to hide contraband. (Doc. 354, at 23).

Lt. Chavez asked for and received the key to the vehicle. (Ex. 8, at 11:00). The key appeared to have both a traditional key that would turn in a lock, as well as remote functionality. (*Id.*) Lt. Chavez remarked to the driver that the VW had no license plate.

5

(*Id.*)  Lt. Chavez testified that although this was not unusual, it would limit the ability to locate the registered owner.  (Doc. 354, at 25).  Lt. Chavez attempted to open the trunk with the remote function of the key fob, but it would not open.  (*Id.*, at 23; Ex. 8, at 11:30).  This made Lt. Chavez suspicious that the trunk had been "disable[d]" to help hide contraband.  (Doc. 354, at 24-25)

He opened the rear passenger side door of the VW and commenced an interior search.  (Ex. 8, at 11:39).  Among other search activities, Lt. Chavez tried the back seat latches to fold the rear seat forward, to no avail.  (*Id.*, at 12:20).  He believed the seat should have folded down and there should have been a passthrough to permit access to the trunk from the passenger compartment.  (Doc. 354, at 26).  He noted that the fabric of the rear console seemed resewn and not "factory."  (*Id.*; Ex. 8, at 12:50).  He also noted that the back seat smelled of grease, something that might have been used to confuse drug detection dogs.  (Ex. 8, at 14:20).  He became suspicious of the carpet that had been glued down, wires running in an unexpected place, and welds that were not consistent with his experience of normal manufacturing of vehicles.  (Doc. 354, at 29-30).  During this process he turned on the VW's ignition and tried various combinations of switches before discovering that the trunk opened with the hazard light switch.  (Ex. 8, at 24:40).

The interior of the trunk appeared suspicious to him due to presence of canned dog food that might have been placed there to distract narcotics detection dogs.  (Doc. 354, at 31).  He was also suspicious of the angle of the back seat which may have been altered to create a compartment for contraband.  (*Id.*)  After making multiple attempts to discover the means to electronically open the suspected hidden compartment, he drilled a hole to manually release the latch holding the seat.  (Doc. 354, at 32).  The ultimate discovery of the methamphetamine was not recorded on the video, but a photograph of the compartment where it was concealed is shown in Exhibit 10 at 2.  Lt.

Chavez testified that the "anomalies" that he noticed during his inspection of the VW were not consistent with normal wear and tear. (*Id.*, at 40).

Inside the VW was a California vehicle registration listing defendant as the owner that was issued on May 24, 2018, and had expired on May 24, 2019. (Ex. 9, at 5). Another registration listing defendant as the owner was located in the vehicle, was issued on May 24, 2019, and had expired on May 24, 2020. (Doc. 354, at 33-34; Ex. 9, at 4). "Belton David Poitier" is also listed as the "registered owner" in a "Notice of Incomplete Renewal and Report of Deposit Fees" with a "date of deposit" of June 11, 2020, that was seized from the VW. (Ex. 9, at 10). A toll evasion citation from June 6, 2019, issued to defendant was also seized from the VW. (*Id.*, at 2). An Automobile Club of Southern California document issued June 6, 2019, and bearing defendant's name (but not listing the VW) was seized from the VW. (*Id.*, at 11). An Iowa Insurance Card that expired November 2, 2020, was located in the VW, but it listed others as the insureds. (*Id.*, at 6).

### IV.   ANALYSIS

In his Motion to Suppress, defendant argues a warrant to search the VW was necessary and because law enforcement officers failed to obtain one, the methamphetamine found in the VW should be suppressed. (Docs. 256 & 256-1, at 3-6). In his Report and Recommendation, Judge Roberts recommended the Court deny defendant's motion to suppress the vehicle search because: (1) defendant lacked standing to assert that his Fourth Amendment rights were violated by the search of the VW, (Doc. 342, at 9-12);[4] (2) the hauler had common authority and could thus consent to the

---

[4] Defendant objects to Judge Roberts' recommendations as to standing and expectation of privacy as though they were separate issues. The Court, however, treats these objections as one because expectation of privacy is a factor considered in the standing determination. *See, e.g.*, *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).

7

search, (*Id.*, at 12-18), and; (3) because probable cause for a warrantless search existed, the automobile exception applied. (*Id.*, at 19-23). Defendant objects to all of Judge Roberts' conclusions. (Doc. 358). The Court will address each objection in turn.

### A. *Standing*

Defendant argues he established a sufficiently close connection to the VW based on the registration cards, parking ticket, and "Notice of Incomplete Renewal and Report of Deposit of Fees" found in the VW reflecting defendant as the VW's registered owner, along with an Automobile Club of Southern California receipt showing defendant as the one charged. (Doc. 358, at 2-3). Based on this evidence, defendant asserts "the weight of the evidence certainly indicates [defendant] was still the registered owner of the vehicle" when the VW was searched in October 2020. (*Id.*, at 3). Judge Roberts found defendant lacks standing to challenge the search of the VW because the evidence did not show a sufficiently close connection between defendant and the VW. (Doc. 342, at 9).

For the following reasons, the Court finds defendant has not shown a sufficiently close connection to the VW to assert constitutional protection.

A defendant cannot assert infringement of his Fourth Amendment rights unless he has standing to do so. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). In determining whether an individual has standing to challenge a vehicle search, "ownership" and "permission" play an important role. *Mosley*, 878 F.3d 246, 255 (8th Cir. 2017). If a defendant proves a "sufficiently close connection" to the place searched, he has standing. *Gomez*, 16 F.3d at 256. Factors relevant to the determination of standing include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

8

*Id.*; *see also Mosley*, 878 F.3d at 255 ("To establish standing, '[t]he defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search.'" (quoting *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) (per curiam)).

Here, no evidence supports that defendant owned the VW or had permission to use the VW when it was searched in October 2020. An expired registration supports that defendant was the VW's registered owner through May 2020, but not the intervening months between May 2020 and October 2020. Each of the expired registrations and various other documents is dated well before October 2020. Thus, the evidence tends to suggest defendant once owned and historically used the car, but it does not tend to suggest he still owned it or had permission to use it in October 2020. Indeed, the insurance card—the only item found that was current during the search—did not list defendant as an insured party. Further, defendant was listed as neither the shipper nor the consignee in the VW's bill of lading. Thus, no evidence links defendant to the hauler's transport of the VW—the context of the search. And considering defendant's unclear relationship to the VW, the Court cannot determine whether defendant had a subjective expectation of privacy or whether the expectation of privacy was objectively reasonable.

For these reasons, the Court finds defendant has not shown a sufficiently close connection to the VW. Thus, defendant lacks standing to assert infringement of his Fourth Amendment rights based on the search of the VW.[5] Nevertheless, the Court continues its analysis of defendant's remaining objections.

---

[5] In his Report and Recommendation, Judge Roberts found that even if defendant had shown a sufficiently close connection to the VW—that is, defendant "was the shipper, the consignee, or at least sufficiently connected to one of them to assert an interest in the vehicle"—defendant would nevertheless lack an objective expectation of privacy in the VW. (Doc. 342, at 10-12). Based on a hypothetical showing of facts, Judge Roberts would find it would be objectively unreasonable for defendant to expect that items in his trunk would remain private because the hauler's "terms and conditions expressly contemplate that the interior of the vehicle, including

## B. Consent to Search

Assuming defendant had standing, defendant asserts that the hauler was a "mere bailee of the vehicle" and did not possess common authority over the vehicle; thus, the hauler could not authorize a consent to search the VW. (Doc. 358, 4).

Judge Roberts found that even if the hauler is a bailee, case law "does not preclude that the bailee under these circumstances could consent to the search," and it is unclear whether defendant was the bailor. Judge Roberts concluded that the driver had apparent authority to consent to the search of the VW. (Doc. 342, at 12-18).

For the following reasons, the Court finds the driver had apparent authority to consent to the search of the VW.

Voluntary consent is a valid exception to the warrant requirement. *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006). Consent "may be given either by the suspect or by some other person who has common authority over, or a sufficient relationship to, the premises to be searched." *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974))). "[C]ommon authority rests on mutual use of the property by persons generally having joint access or control for most purposes." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1999) (quotation omitted and emphasis added). The Eighth Circuit has interpreted "most purposes" as modifying only "control." *See United States v. Chavez Loya*, 528 F.3d 546, 554 (8th Cir. 2008). Entrusting an item to a common carrier does not give the common carrier actual authority to consent to the search of the item's inner contents. *United States v. James*, 353 F.3d 606, 614 (8th Cir. 2003).

---

the trunk, would be inspected for excessive or impermissible personal property." (*Id.*, at 12). In his objections to the Report and Recommendation, defendant argues his expectation of privacy was objectively reasonable because the inspections provided in the hauler's terms and conditions are limited to "before and after the shipment with the shipper and consignee to assure that there wasn't any damage cause [sic] by the carrier." (Doc. 358, at 4). The Court agrees with Judge Roberts' analysis, but because the Court concludes defendant did not show a sufficiently close connection to the VW, it need not reach defendant's expectations of privacy.

When in conjunction with other circumstances supporting the existence of common authority, however, entrusting an item to a common carrier can give the common carrier apparent authority. *See Illinois*, 497 U.S. at 187; *Matlock*, 415 U.S. at 171 n.7.

"The authority which justifies the third-party consent does not rest upon the law of property, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is *reasonable* to recognize that any of the co-inhabitants has [1] the right to permit the inspection in his own right and [2] that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n.7 (emphasis added). "[W]hat is generally demanded of the many factual determinations that must regularly be made by agents of the government—[including] the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable." *Rodriguez*, 497 U.S. at 185. Establishing common authority is the government's burden. *Id.*, at 181.

Based on the foregoing, the Court agrees with Judge Roberts that the case law does not preclude that the bailee under these circumstances could consent to the search. Given defendant's tenuous connection to the vehicle, the Court also agrees it is unclear whether defendant was the bailor.

The Court also agrees with Judge Roberts that the driver had apparent authority to consent to the search of the VW. Based on the circumstances before him, the government must show it was reasonable for Lt. Chavez to conclude the hauler—and thus, the driver—generally had (1) joint access to the VW or (2) control over the VW for most purposes. This joint access or control for most purposes would mean the driver had the right to permit the inspection of the VW in his own right, and others with common authority in the VW had assumed the risk that another person with common authority

might permit the VW to be searched. *See Matlock*, 415 U.S. at 171 n.7; *Rodriguez*, 497 U.S. at 185; *Chavez Loya*, 528 F.3d at 554.

Here, the Court finds it was reasonable for Lt. Chavez to conclude the driver had joint access to the VW. As the body camera video showed, the driver had keys to the VW and could freely access it. Lt. Chavez testified that typically shipping paperwork would not limit a hauler's right to enter the vehicle. Lt. Chavez testified he did not review the terms on the back of the bill of lading for the VW,[6] just as he had not reviewed the terms on the back of the bill of lading relating to other vehicles he had searched. In Lt. Chavez's experience, haulers have reserved the right to make inspection of the vehicle for safety reasons. The body camera video showed and Lt. Chavez testified that the driver was suspicious of the VW, giving rise to its search. The driver's transaction with the VW reminded him of a prior transaction when he had unwittingly been involved in the transportation of 22 pounds of methamphetamine. This could reasonably be interpreted as a safety concern that would trigger the hauler's inspection rights. Under these circumstances, it was reasonable for Lt. Chavez to conclude the driver could permit inspection of the VW in his own right and that others with common authority had assumed the risk that he might do so.

For these reasons, the Court finds the driver had apparent authority to consent to the search of the VW. Again, the Court continues its analysis of defendant's remaining objections.

### C. *Automobile Exception*

Defendant argues the automobile exception does not apply because that exception exists to prevent suspects from fleeing in vehicles and hiding evidence of a crime, and

---

[6] Though Lt. Chavez did not review these terms, they provide for inspection of a vehicle's trunk. (Ex. 9A). It is not clear whether the hauler inspected the VW's trunk or when that inspection would take place. (*Id.*).

12

those concerns were not present here. (Doc. 358, at 5-6). Defendant asserts that because the carrier was cooperative with the police, "there was no chance that the contents would not be found again if the officers had obtained a warrant." (*Id.*). Defendant does not appear to debate the existence of probable cause based on Lt. Chavez's knowledge and what he witnessed at the truck stop.

Judge Roberts concluded that probable cause existed for a warrantless search and that the automobile exception applied. (Doc. 342, at 24). Specifically, Judge Roberts pointed to: Lt. Chavez's "extensive experience in contraband interdiction, especially in the detection of hidden compartments of motor vehicles," the driver's suspicions aligning with those of Lt. Chavez, the missing phone number for the consignee on the bill of lading, the cash advance payment, the shipper's comment that the VW was a "graduation gift" despite the typical graduation season being months away, the high price of shipping paid in cash, the absence of a license plate, missing screws and bolts on the vehicle's underside, and the broken key fob. (*Id.*, at 23).

For the reasons cited by Judge Roberts, the Court finds that Lt. Chavez had probable cause to search the VW without a warrant and the automobile exception applied. The Court also finds that the policy justification of the automobile exception is in keeping with this warrantless search. To conduct a warrantless search under the automobile exception, the only requirement is that law enforcement officers must have probable cause to believe that the vehicle contains contraband or other evidence of criminal activity. *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996). Defendant is correct that the automobile exception was originally justified by the "practical challenges of obtaining a warrant for a vehicle that could be 'quickly moved' out of the jurisdiction." *United States v. Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) (quoting *Carroll v. United States*, 267 U.S. 132, 153 (1925)). This has become known as the "inherent mobility" justification. *See California v. Carney*, 471 U.S. 386, 404 (1985) (Stevens, J.,

dissenting). But the automobile exception has expanded to include a second justification: pervasive regulation. *See South Dakota v. Opperman*, 428 U.S. 364, 368 (1976). Here, the automobile exception is appropriate based on the enhanced police powers that the state exercises over vehicles. Though defendant may have preferred that law enforcement officers wait to search the VW, they were not legally required to.

## V. CONCLUSION

For the reasons stated above, defendant's objections (Doc. 358) are **overruled**. The Court **adopts** Judge Roberts' Report and Recommendation (Doc. 342) and **denies** defendant's Motion to Suppress evidence of the vehicle search (Doc. 256).

**IT IS SO ORDERED** this 23rd day of January, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa